**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| Las Americas Immigrant Advocacy Center, )<br><br>Plaintiff, )<br><br>v. )<br><br>Ken Paxton, in his official capacity as the Attorney General of Texas, )<br><br>Defendant. ) | Case No. 3:24-cv-00352 |

<u>**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION**</u>

<u>**HEARING REQUESTED ON OR BEFORE FRIDAY, SEPTEMBER 27, 2024**</u>

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTS .................................................................................................................... 3

III. ARGUMENT ............................................................................................................. 5

    A.   Las Americas Is Likely to Succeed on the Merits of Its First Amendment Claims. 5

        1.   Las Americas Is Likely to Establish It Engages in First Amendment Expression & Association. ......................................................................... 6

        2.   Las Americas Is Likely to Succeed on the Merits of its First Amendment Retaliation Claims. ........................................................................... 8

            (a)   Las Americas' provision of services to clients is a protected activity, as is its speech advocating for a more just immigration landscape. ................................................................... 9

            (b)   The CID would chill the speech of a person of ordinary firmness. ........................................................................... 9

            (c)   Defendant targeted Las Americas because of Las Americas' protected activity ....................................................... 11

        3.   Las Americas Is Likely to Succeed on the Merits of its First Amendment Coercion Claim. ............................................................... 13

        4.   Las Americas Is Likely to Succeed on the Merits of its Expressive Association Claim. .......................................................................... 18

            (a)   The CID and Surrounding Investigation Likely Impair Las Americas' Right to Expressive Association. ............................. 19

            (b)   The CID and Surrounding Investigation Likely Fail Exacting Scrutiny. ...................................................................... 22

    B.   Las Americas Is Likely to Face Irreparable Harm Without Issuance of a Temporary Restraining Order & Preliminary Injunction. .................................... 23

    C.   The Equities Weigh in Favor of an Injunction and an Injunction Is in the Public Interest. ........................................................................................... 24

IV.  CONCLUSION .................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americans for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)...............................................................................................19, 22, 23

*Annunciation House, Inc. v. Ken Paxton*,
    205th Judicial Dist. (2024) (No. 2024DCV0616)...................................................16

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ..................................................................................18

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ..................................................................................................14

*Bart v. Telford*,
    677 F.2d 622 (7th Cir. 1982) ..................................................................................10

*Bates v. City of Little Rock*,
    361 U.S. 516 (1960).................................................................................................21

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000).................................................................................................19

*Collins v. Ainsworth*,
    382 F.3d 529 (5th Cir. 2004)...................................................................................22

*Crawford–El v. Britton*,
    523 U.S. 574 (1998)...................................................................................................8

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................................................23

*Garcia v. City of Trenton*,
    348 F.3d 726 (8th Cir. 2003) ..................................................................................10

*Hartman v. Moore*,
    547 U.S. 250 (2006)............................................................................................8, 11

*Hines v. Quilivan*,
    982 F.3d 266 (5th Cir. 2020) ....................................................................................7

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010).................................................................................................23

*Just. For All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) ................................................................5

*Keenan v. Tejeda*,
290 F.3d 252 (5th Cir. 2002) ....................................................8, 10, 11

*Ken Paxton and the State of Tex. v. FIEL Houston, Inc.*,
127th Judicial Dist. (2024) (No. 2024-43394) ....................................16

*Las Americas Immigrant Advoc. Ctr. v. McCraw*,
No. 23-cv-01537, Dkt. 1 (W.D. Tex. Dec. 19, 2023) ...........................12

*Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*
(D.D.C. 2024) ......................................................................................12

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001)...............................................................................7

*McDonald v. Longley*,
4 F.4th 229 (5th Cir. 2021) .................................................................24

*Meyer v. Grant*,
486 U.S. 414 (1988)...............................................................................9

*Missouri v. Biden*,
83 F.4th 350 (5th Cir. 2024), *rev'd and remanded on other grounds sub nom.*
*Murthy v. Missouri*, 144 S. Ct. 1972 (2024) ...............................14, 15, 16

*Mote v. Walthall*,
902 F.3d 500 (5th Cir. 2018) ..............................................................19

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977)...............................................................................8

*N.A.A.C.P. v. Button*,
371 U.S. 415 (1963)......................................................................6, 7, 8

*N.A.A.C.P. v. State of Ala. ex rel. Patterson*,
357 U.S. 449 (1958)........................................................................19, 21

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)...............................................................................7

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)......................................................................13, 14, 18

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003).................................................................16

*Opulent Life Church v. City of Holy Springs, Miss.*,
  697 F.3d 279 (5th Cir. 2012) ...............................................................23

*In re Primus*,
  436 U.S. 412 (1978)..............................................................................7

*Robinson v. Hunt Cnty., Tex.*,
  921 F.3d 440 (5th Cir. 2019) ...............................................................18

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020)............................................................................23

*Smith v. Tarrant Cnty. Coll. Dist.*,
  670 F. Supp. 2d 534 (N.D. Tex. 2009) ..................................................5

*Speaks v. Kruse*,
  445 F.3d 396 (5th Cir. 2006) ...........................................................5, 24

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013) ...............................................................24

*United Mine Workers of America, District 12 v. Illinois State Bar Ass'n*,
  389 U.S. 217 (1967)............................................................................22

**Statutes**

8 U.S.C. § 206.......................................................................................20

42 U.S.C. § 1983.....................................................................................5

Tex. Bus. & Comm. Code § 17.62(b) ....................................................15

Texas Deceptive Trade Practices Act ............................................... *passim*

**Other Authorities**

Berenice Garcia, *Texas Attorney General Can't Question Catholic Charities
  Director Over Migrant Services, Court Says*, Texas Tribune (July 24, 2024
  5:00 P.M.), https://www.texastribune.org/2024/07/24/texas-border-charities-
  migrants-attorney-general-investigation-court-r/...................................15

https://www.uscis.gov/CHNV ..................................................................2

Letter from Governor Greg Abbott to Attorney General Ken Paxton at 1 (Dec. 14,
  2022), https://gov.texas.gov/uploads/files/press/Ken_Paxton_OAG_.pdf ............12

Press Release, *Attorney General Ken Paxton Seeks Injunction Halting Border NGO's Systemic Criminal Conduct in Texas*, Office of Attorney General (May 8, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-seeks-injunction-halting-border-ngos-systemic-criminal-conduct-texas ...................................................................................................12, 15

Press release, *Attorney General Ken Paxton Will Continue to Defend Texas Border Security Law After Court Blocks it from Taking Effect*, Office of Attorney General (Feb. 29, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-will-continue-defend-texas-border-security-law-after-court-blocks-it .......................12

R. of Prof. Conduct, § 1.05(a–b) (State Bar of Tex. 2022)......................................................19, 20

Senate Bill 4.................................................................................................................................12

Special to El Paso Matters, *Texas' Attorney General is Increasingly Using Consumer Protection Laws to Pursue Political Targets*¸ El Paso Matters (May 30, 2024), https://elpasomatters.org/2024/05/30/texas-ag-ken-paxton-annunciation-house-ruben-garcia-consumer-protection-laws....................................................17

U.S. Const. amend. I ............................................................................................... *passim*

Valerie Gonzalez, *Texas is Still Investigation Migrant Aid Groups on the Border After a Judge's Scathing Order*, NBC 5 News DFW (July 6, 2024, 9:48 AM), https://www.nbcdfw.com/news/local/texas-news/texas-migrant-aid-group-investigation/3585182/?os=icXa75GDUbbewZKe8C&ref=app...............................................17

Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") requests this Court issue a temporary restraining order enjoining Defendant Ken Paxton, in his official capacity as Attorney General of Texas ("Defendant"), and his officers, employees, and agents from enforcing the Civil Investigative Demand ("CID"), issuing any other CID or action related to allegations of fraudulent or deceptive legal representation or services, or otherwise abusing his investigative powers to harass Las Americas, for sufficient time for the Court to issue a preliminary injunction granting the same relief during the pendency of this litigation.

**Because of the emergency nature of this request, Las Americas requests a hearing on its Motion for Temporary Restraining Order on or before September 27, 2024.**

## I.      INTRODUCTION

Throughout this year, Defendant has engaged in an organized harassment campaign, including attempts to shut down numerous immigration non-profit organizations that are doing nothing more than serving those in need and ensuring that people are welcomed with dignity at the U.S.-Mexico border. Starting with a knock on the door at the El Paso-based Annunciation House shelter demanding entry and confidential records, Defendant has systemically targeted not only Annunciation House but also other immigration non-profits in Texas, including Catholic Charities of the Rio Grande Valley, Team Brownsville Inc., and FIEL. The list of immigration non-profits targeted has now grown to include Las Americas Immigrant Advocacy Center. This targeting has created an atmosphere of fear and chilled the services of immigration service providers across the state of Texas, including Las Americas.

On September 4, 2024, Las Americas received a CID demanding information related to the CHNV parole program[1]—a program that is not a focus of the legal services provided by Las Americas. The CID, issued under section 17.61 of the Texas Deceptive Trade Practices Act ("DTPA"), states that the investigation is related to "fraudulent and deceptive legal representations and services." This is yet another attempt to harass and bully a non-profit immigration legal services provider out of furthering its mission to serve a vulnerable migrant population for one reason: Las Americas' mission does not align with Defendant's ideology. Despite this intimidation tactic, Las Americas must respond to this illegal demand by September 27, 2024, and respectfully requests a hearing for a Temporary Restraining Order on or before that date.

Las Americas filed suit contemporaneously with filing this Motion, alleging the CID and the related investigation violate its First Amendment rights because the CID and investigation are (1) retaliatory actions intended to silence Las Americas' protected activity; (2) a viewpoint- and content-based restriction attempt to coerce Las Americas into suppressing protected expression; and (3) an infringement on Las Americas' right to expressive association through compelled disclosure of its clients and their confidential and private information, which fails exacting scrutiny. Dkt. 1.

Las Americas now seeks emergency intervention from this Court to enjoin Defendant from inflicting more irreparable harm before this Court has the opportunity to resolve the merits of the matter. This relief is warranted and urgently necessary because Las Americas faces the risk of irreparable injury and, if this Court does not act, Defendant has the power to potentially deprive this Court of jurisdiction through State court enforcement.

---

[1] The parole program for Cubans, Haitians, Nicaraguans, and Venezuelans was created by the Department of Homeland Security in 2023, allowing individuals from those countries to apply while still in their home countries for authorization to enter the United States via airplane. https://www.uscis.gov/CHNV.

Because Las Americas satisfies every factor for emergency relief, this Court should grant the Motion, enjoin Defendant from enforcing the CID, and set a hearing for a preliminary injunction.

## II.    FACTS

Founded in 1987, Las Americas Immigrant Advocacy Center is a non-profit corporation dedicated to providing direct legal services to low-income immigrants in El Paso, Texas. Compl., Dkt. 1 ¶ 6. Since its inception, Las Americas has served over 40,000 people from over 77 countries. *Id.* Its team remains on the frontlines at the U.S.-Mexico border, responding to various humanitarian crises caused by ever-changing immigration policies. *Id.* Las Americas is one of the few non-profit legal service providers that takes on complex immigration cases and provides immigration services in the El Paso-Ciudad Juarez area. *Id.* Like many non-profit organizations engaged in humanitarian work, Las Americas operates with a small team with limited resources. *Id.* ¶ 8. Despite its valiant efforts, Las Americas simply cannot meet the demand for immigration legal services.  *Id.* ¶¶ 14, 19.

In 2024, Defendant began targeting immigration non-profit organizations, alleging that these organizations were acting illegally under state law. *Id.* ¶ 25. As of the filing of this Motion, no court in Texas has granted Defendant any relief on these matters and he has soundly lost every case. *Id.* ¶¶ 25–27.  Las Americas is the latest immigration non-profit caught in the Defendant's political rampage to shut down organizations with whom he disagrees. *Id.* ¶¶ 38–40.

On September 4, 2024, Las Americas received a CID under section 17.61 of the DTPA from Defendant's Office. *Id.* ¶ 40. The CID alleged that the investigation was related to possible violations of section 17.46(a) and (b) of the DTPA, which includes "fraudulent and deceptive legal representations and services." *Id.*

The CID specifically directed Las Americas to produce:

1.     All communications between Las Americas and the United States Department of Homeland Security and/or U.S. Citizenship and Immigration Services concerning the federal Parole Program for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) during the relevant time period.

2.     All informational documents, forms, and instructions provided by Las Americas to potential or actual immigrants and/or beneficiaries applying for the federal Parole Program for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) during the relevant time period.

3.     All informational documents, forms, and instructions provided by Las Americas to potential or actual supporters of and/or sponsors applying for the federal Parole Program for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) during the relevant period.

4.     Part 7 of all Form I-134A documents that Las Americas has participated in preparing.

The CID includes a return date of September 27, 2024. Dkt. 1, Ex. 1 (CID - Dkt. 3).

The CID and Defendant's baseless underlying investigation represent an existential threat to Las Americas' legal and public advocacy. Already, Las Americas has notified its malpractice insurer and funders about the investigation into "fraudulent" legal services. Compl., Dkt. 1 ¶¶ 69–70. And it has already attempted to notify clients directly affected by the CID. *Id.* ¶¶ 52, 68. It is also working to alter the confidentiality provisions in its intake process to notify clients that, despite the historical and constitutional safeguard of attorney-client confidences, it is subject to a baseless investigation that could result in confidential information being produced. *Id.* ¶ 53. As a legal services organization, this is damning, frightening, and, ultimately, directly interferes with the services it provides to its clients. *Id.* ¶¶ 51.

Las Americas is also a public-facing advocacy organization. In the weeks since the CID it has prohibited staff from answering audience questions at Know Your Rights presentations, *id.* ¶ 50, notified partner organizations of the investigation, *id.* ¶ 58, and declined media interviews, *id.* ¶ 57, all specifically in response to the threat of the CID and investigation. Finally, as a plaintiff in two federal civil rights cases adverse to Defendant, Las Americas recognizes that the self-

censorship it is experiencing now is all a part of Defendant's plan to send a message that legal advocacy on behalf of immigrant non-profits will not be tolerated. *Id.* ¶ 64.

### III.   ARGUMENT

To enter a temporary restraining order or a preliminary injunction, the Court must find four factors, on balance, weigh in Las Americas' favor:

> (1)   a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (quotations omitted); *see also Smith v. Tarrant Cnty. Coll. Dist.*, 670 F. Supp. 2d 534, 537 (N.D. Tex. 2009) (applying same factors to temporary restraining order).

Las Americas is entitled to a temporary restraining order and preliminary injunction pending a final judgment on the merits as it is likely to succeed on the merits of each of its First Amendment claims relating to the CID. In addition, Las Americas will suffer irreparable injury if Defendant is able to enforce the CID, that injury would outweigh any harms should the injunction be granted, and it would not disserve the public to enter such an injunction.

### A.   Las Americas Is Likely to Succeed on the Merits of Its First Amendment Claims.

In a First Amendment case under § 1983, the Court must first determine whether "the speech at issue . . . is protected under the First Amendment." *Just. For All v. Faulkner*, 410 F.3d 760, 764 (5th Cir. 2005). The Court then determines "the proper level of constitutional scrutiny to apply to" the action in question. *Id.* Las Americas is likely to succeed on the merits of its First Amendment claims.

First, Las Americas is likely to establish that its provision of legal services to low-income immigrants is protected speech and association under the First Amendment. Second, Las Americas is likely to succeed on its claim that Defendant's CID and surrounding investigation are an adverse retaliatory action designed to stifle Las Americas' protected expression and association, both for its aid to immigrants and for its political advocacy and litigation work. Third, Las Americas is likely to succeed on its claim that Defendant's CID and surrounding investigation unconstitutionally coerce Las Americas into silencing its protected activity. Fourth, Las Americas is likely to succeed on its claim that Defendant's CID and surrounding investigation threaten its rights to expressive association and fail exacting scrutiny.

### 1.  Las Americas Is Likely to Establish It Engages in First Amendment Expression & Association.

Las Americas' provision of non-profit legal services to low-income immigrants constitutes protected speech and association. For decades, the Supreme Court has recognized that organizations like Las Americas exercise protected speech and association by speaking with and representing low-income clients for a nonprofit purpose. In *N.A.A.C.P. v. Button*, 371 U.S. 415 (1963), for example, the Court invalidated a Virginia law which restricted attorneys' solicitation of legal business. *Id.* at 423. After Virginia courts held that the canon of professional ethics applied to the NAACP, the Court reversed and invalidated the law's application to the NAACP because "the activities of the NAACP . . . are modes of expression and association protected by the First and Fourteenth Amendments." *Id.* at 428–29. The Court reasoned that the NAACP's legal activities—including its ability to foster relationships with clients—"makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society" and that, "[f]or such a group, association for litigation may be the most effective form of political association." *Id.* at 431.

Since its decision in *Button*, the Supreme Court has consistently held that the provision of legal services for a non-profit purpose constitutes protected speech and association. *In re Primus*, 436 U.S. 412, 431 (1978) ("The ACLU engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public."); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) ("There can be little doubt that the [Legal Services Corporation] Act funds constitutionally protected expression[.]"). And recently, the Supreme Court abrogated the professional speech doctrine adopted in some circuits, including the Fifth Circuit, by holding that the speech of licensed professionals with their clients—including for-profit attorneys—receive First Amendment protection. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 771 (2018) ("[T]his Court has applied strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers."); *Hines v. Quilivan*, 982 F.3d 266, 271–72 (5th Cir. 2020) (recognizing abrogation of professional speech doctrine).

The above authorities clearly demonstrate that Las Americas is likely to establish that it engages in protected speech and association when it provides legal services to clients for a non-profit purpose. Las Americas is a 501(c)(3) non-profit organization, and since its founding in 1987, it has provided legal services to low-income immigrants in the El Paso, Texas area—a community that desperately needs greater access to legal resources. Compl, Dkt. 1, ¶ 14. In addition, Las Americas provides public workshops to share information with individuals in their community who may otherwise not receive it. *Id.* ¶ 15. To carry out its work, Las Americas speaks with prospective clients and members of the broader El Paso region. *Id.* ¶ 9. Through these interactions, Las Americas develops important attorney-client relationships with a population who may not otherwise have access to the legal services they need for a smooth transition and entry into the U.S. *Id.* ¶¶ 23–24. Just like the ACLU in *Primus* or the NAACP in *Button*, Las Americas' provision

of legal services "makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society" and is protected by the First Amendment. *Button*, 371 U.S. at 431. Thus, Las Americas is likely to establish that it engages in protected speech and association under the First Amendment.

> ### 2. Las Americas Is Likely to Succeed on the Merits of its First Amendment Retaliation Claims.

Las Americas is also likely to succeed on its First Amendment Retaliation claims. The Supreme Court has stated: "[o]fficial reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (alteration in original) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 n. 10 (1998)).

Under Fifth Circuit precedent, to prove its First Amendment retaliation claim, Las Americas must show that: (1) Las Americas is engaged in protected activity; (2) Defendant's actions would "chill a person of ordinary firmness from continuing to engage in that activity;" and (3) Defendant's "adverse actions were substantially motivated against [Las Americas'] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (collecting cases). Once Las Americas establishes a prima facie case, the burden shifts to Defendant to establish "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Las Americas is likely to establish all the elements of its retaliation claim, and no non-retaliatory motive can explain Defendant's actions.

(a)     *Las Americas' provision of services to clients is a protected activity, as is its speech advocating for a more just immigration landscape.*

As discussed above, Las Americas is likely to establish that its provision of legal services and community education for a non-profit purpose constitutes protected expression and association that the First Amendment protects. *Supra* § III.A.1.

In addition to its activity with clients, Las Americas has also repeatedly engaged in advocacy to create a more just landscape for migration in Texas.  For example, Las Americas sued the State of Texas, successfully enjoining the anti-immigrant Senate Bill (SB) 4 law. Compl, Dkt. 1, ¶ 20. In addition to being a plaintiff in the SB 4 case, Las Americas is also a plaintiff in a lawsuit seeking to enjoin the Biden executive order that severely restricts the right to asylum. *Id*. ¶ 21.

Las Americas also regularly engages in education and outreach. First, Las Americas regularly informs immigrants—on both sides of the border—what their rights are to receive immigration relief in the United States. *Id.* ¶¶ 10–18. Second, their work also consists of staff participating in protests, community education events, conferences, trainings, and other public forums to advocate for the rights of immigrants living in El Paso, and to further connect with individuals in need of its services. *Id*. ¶¶ 19–22; *see Meyer v. Grant*, 486 U.S. 414, 422 (1988) ("[I]nteractive communication concerning political change [] is appropriately described as 'core political speech.'").

(b)     *The CID would chill the speech of a person of ordinary firmness.*

The CID, including its baseless allegations of "fraudulent and deceptive" legal services, and the surrounding investigation and hostility towards immigration non-profit organizations would chill a person of reasonable firmness from engaging in expressive activity. Pivotally, a person does not actually need to stop speaking out entirely to meet this standard—plaintiffs need

9

only show that a person of ordinary firmness would feel a chilling effect. *Keenan*, 290 F.3d at 259-60.

"Decisions of [the Fifth Circuit] and other circuits have found that various concrete intimidating tactics would have deterred ordinary persons from criticizing government officials," including a county's decision to withhold advertising funds from a newspaper, a judge's retaliatory decision to release confidential and humiliating information, and a planning board's denial of a land use permit. *Id.* at 258 (collecting cases). *See also Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (the retaliatory issuance of parking tickets totaling $35 created a jury issue because the defendant "engaged the punitive machinery of government in order to punish Ms. Garcia for her speaking out"); *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982) ("campaign of petty harassments" against the plaintiff including "[h]olding her up to ridicule for bringing a birthday cake to the office" stated a cause of action for retaliation).

Defendant's actions in this case are far more intimidating than the various actions cited in *Keenan*. The CID issued to Las Americas comes in the midst of a several-month tirade where Defendant has publicly attacked immigrant non-profits and has responded to the non-profits' efforts to comply with investigations and their objections to investigations with aggressive filings to dissolve the non-profits entirely. Compl., Dkt. 1 ¶¶ 25–26; *see, e.g.*, *id.* ¶¶ 27–29. Though no court has yet granted Defendant any of his requested relief, his attempts still strike fear and apprehension across the immigration non-profit community. *Id.* ¶¶ 29–31.

Additionally, for Las Americas, an immigration legal services organization, the CID's suggestion of "fraudulent and deceptive" legal services and demand for client files represent an existential threat to its mission and its ability to develop client relationships central to furthering that mission *Id.* ¶ 51. Even a perceived violation of the attorney-client relationship and imposition

of unreasonable barriers to entry would deter potential clients from seeking services as the news of such hindrances would quickly spread through the tight-knit El Paso community. *Id.* ¶¶ 24, 66–68.  As a result, any legal services organization—or any law firm for that matter—will predictably respond to a CID by altering the services it offers, which is what Las Americas has done, *Id.* ¶¶ 50, 59, and this is precisely Defendant wants, *id.* ¶ 31. In Las Americas' case, that means censoring its protected expression and association with the hope of continuing to provide at least some services in alignment with its mission. *Id.* ¶ 63.

Las Americas has already felt these chilling effects of the CID. Las Americas has limited and narrowed the scope of its Know Your Rights presentations and created a policy of not answering questions at the end of such presentations for fear it will be asked a question about a service that Defendant is opposed to, and therefore, be subject to another CID in the future. *Id.* ¶ 50. Las Americas also has censored and limited the services it offers for fear it will offer services in a way or for a program Defendant disagrees with—such as by no longer prioritizing complex cases or changing how clients can access its space to receive help. *Id.* ¶¶ 59-60. It has also limited its advocacy and media outreach to avoid being placed further in Defendant's cross-hairs. *Id.* ¶ 57. Accordingly, Las Americas can successfully show that Defendant's conduct would chill a person of ordinary firmness.

        *(c)*     *Defendant targeted Las Americas because of Las Americas' protected activity.*

Las Americas is likely to establish that its protected expression substantially motivated Defendant's investigation and CID. *See Keenan*, 290 F.3d at 258. Causation, in this context, is "but-for" causation, meaning "without [the retaliatory motive] the adverse action would not have been taken." *Hartman*, 547 U.S. at 260.

First, Defendant's own statements demonstrate that his intent is to punish immigration service providers for their work and advocacy. Just this past March, Defendant told organizations

like Las Americas that "[a]ll NGOs who are complicit in Joe Biden's illegal immigration catastrophe . . . should consider themselves on notice" that he would use investigatory weapons like the CID to come after organizations serving immigrant communities.[2] Defendant's statement followed a December 2022 letter from Governor Abbott instructing the Defendant to "remain vigilant" of "reports" that "non-governmental organizations . . . have assisted with illegal border crossings near El Paso."[3]

Further, Defendant likely has known about Las Americas' provision of legal services to immigrants, perhaps for decades, but at least since December of 2023, when Las Americas sued Texas officials in an effort to enjoin enactment of Senate Bill 4, a bill designed to give state law enforcement officers and judges unconstitutional authority over immigration enforcement. *See Las Americas Immigrant Advoc. Ctr. v. McCraw*, No. 23-cv-01537, Dkt. 1 (W.D. Tex. Dec. 19, 2023). Las Americas was successful in enjoining SB4, and Defendant has responded by touting this law and said, "I will do everything possible to defend Texas's right to defend herself against the catastrophic illegal invasion encouraged by the federal government."[4]

Since then, Defendant also has attempted to intervene adversely to Las Americas in another immigration case brought by various plaintiffs, including Las Americas. *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.* (D.D.C. 2024) (No. 24-cv-01702). Investigating a plaintiff that is adverse to the state in two ongoing lawsuits is strong evidence of

---

[2] Press Release, *Attorney General Ken Paxton Seeks Injunction Halting Border NGO's Systemic Criminal Conduct in Texas*, Office of Attorney General (May 8, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-seeks-injunction-halting-border-ngos-systemic-criminal-conduct-texas ("All NGOs who are complicit in Joe Biden's illegal immigration catastrophe and think they are above the law should consider themselves on notice.").
[3] Letter from Governor Greg Abbott to Attorney General Ken Paxton at 1 (Dec. 14, 2022), https://gov.texas.gov/uploads/files/press/Ken_Paxton_OAG_.pdf.
[4] Press release, *Attorney General Ken Paxton Will Continue to Defend Texas Border Security Law After Court Blocks it from Taking Effect*, Office of Attorney General (Feb. 29, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-will-continue-defend-texas-border-security-law-after-court-blocks-it.

retaliation, and the CID is a clear attempt to deter Las Americas from speaking out against government actions that harm the immigrant population and that Defendant supports.

In addition to Las Americas' legal activity with which Defendant disagrees, the entire basis of the CID is a vague and specious statement about the provision of fraudulent and deceptive legal representations and services. Dkt. 1, Ex. 1 (CID - Dkt. 3). Nothing in the CID specifies what actions Las Americas may have taken to warrant such egregious allegations. *Id.* This is unsurprising, given that Defendant is on a political campaign to shut down immigrant service organizations. *See generally* Compl., Dkt. 1 § IV.A. To undersigned counsel's knowledge, Defendant has never enforced the DTPA against a legal services non-profit—until now. If Las Americas engaged in different protected expression—e.g., represented low-income persons in landlord-tenant disputes or helped small businessowners with contract matters—Defendant would not pursue these retaliatory actions against them. *Id.* ¶ 31. It is Las Americas' protected expression, then, that substantially motivates the retaliatory actions. Therefore, Las Americas is likely to satisfy each element of its retaliation claim.

### 3.    Las Americas Is Likely to Succeed on the Merits of its First Amendment Coercion Claim.

Las Americas is likely to establish that the CID and surrounding investigation are viewpoint- and content-based attempts to coerce it into suppressing protected expression. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). And while Defendant can "share [his] views freely," he cannot use "the power of the State to punish or suppress disfavored expression." *Id.* at 187–88. In evaluating claims of viewpoint discriminatory coercion, courts look "through forms to substance"

and "recognize that informal censorship may sufficiently inhibit the circulation of [protected expression] to warrant injunctive relief." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

In *Vullo*, the U.S. Supreme Court held that to state a claim of unconstitutional coercion under the First Amendment, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." 602 U.S. at 191. In making that determination, the Court embraced four "guideposts" in determining whether government coercion violates the First Amendment: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* at 191, 189. However, these considerations are "nonexhaustive" because the analysis turns on a "totality-of-the-circumstances." *Id.* at 190–91.

Applied here, each of the four guideposts from *Vullo* demonstrate that Las Americas is likely to succeed on the merits of its First Amendment coercion claim.

First, the inherent tone and word choice of the CID coupled with the circumstances surrounding the related investigation demonstrate that Defendant is using the CID as an impermissibly coercive threat. The CID itself is styled as a "Civil Investigative *Demand*," signed by an Assistant Attorney General, and states that Las Americas is not only "directed" but "require[d]" to produce documents in response." *See* Dkt. 1, Ex. 1 (CID - Dkt. 3); *compare Bantam Books, Inc.*, 372 U.S. at 68 (finding unconstitutional notices were "phrased virtually as orders"). Las Americas received the CID on September 4, 2024, with a response demanded by September 27, 2024, Dkt. 1, Ex. 1 (CID - Dkt. 3). *See Missouri v. Biden*, 83 F.4th 350, 383 (5th Cir. 2024), *rev'd and remanded on other grounds sub nom. Murthy v. Missouri*, 144 S. Ct. 1972 (2024) (recognizing "urgency" as factor under the first prong).

14

With a small team and limited resources, receiving and responding to the CID in less than a month from receipt presented a burden for Las Americas, one that has interrupted its work flow. Compl., Dkt. 1 ¶¶ 55–56, 69–70. The CID also instructs Las Americas that Defendant believes Las Americas—a non-profit legal organization—possesses documents relevant to "fraudulent and deceptive legal representations and services." *Id.*, Ex. 1 (CID - Dkt. 3). A suggestion that any legal services provider is engaged in fraudulent or deceptive practices—especially when the mission of the organization is to provide services to immigrants through permissible legal channels—inevitably raises concern and fear within the organization.

The CID was also served on Las Americas during a time when the highest levels of Texas government have been baselessly threatening immigrant community service providers,[5] including by filing unprecedented lawsuits seeking dissolution of immigrant-serving nonprofits and making broad proclamations about "investigations" into progressive non-profits.[6] In fact, Defendant himself went as far as to say that "[a]ll NGOs who are complicit in Joe Biden's illegal immigration catastrophe . . . should consider themselves on notice."[7] In this context, the tone and word choice of the investigation clearly demonstrate it is a coercive threat designed to suppress Las Americas' protected activity of providing non-profit legal assistance to indigent immigrants. *Missouri*, 83 F.4th at 383 (instructing courts to evaluate tone and word choice based on "the parties' relationship and the conduct of the government in context").

Second, Defendant possesses immense regulatory authority, both real and imagined. Under the DTPA, Defendant possesses specific regulatory authority to enforce CIDs, Tex. Bus. & Comm.

---

[5] Berenice Garcia, *Texas Attorney General Can't Question Catholic Charities Director Over Migrant Services, Court Says*, Texas Tribune (July 24, 2024 5:00 P.M.), https://www.texastribune.org/2024/07/24/texas-border-charities-migrants-attorney-general-investigation-court-r/

[6] *Supra*, n3.

[7] Press Release, *Attorney General Ken Paxton Seeks Injunction Haltin Border NGO's Systemic Criminal Conduct in Texas*, Office of Attorney General (May 8, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-seeks-injunction-halting-border-ngos-systemic-criminal-conduct-texas

Code § 17.62(b), and to file enforcement actions. *Id.* § 17.47. It is a crime to intentionally avoid or evade compliance with the CID. *Id.* § 17.62(a). While such authority exists, Defendant should not be permitted to weaponize every tool at his disposal to harass and intimidate similarly situated non-profits solely because their mission goes against Defendant's beliefs.

For example, Defendant filed a baseless action against another El Paso non-profit service provider seeking to terminate the corporation's existence. *Annunciation House, Inc. v. Ken Paxton*, 205th Judicial Dist. (2024) (No. 2024DCV0616). In yet another case, Defendant sought to shut down an immigrant service provider in Houston by asking a court for a dissolution and revocation of the entity's corporate charter. *Ken Paxton and the State of Tex. v. FIEL Houston, Inc.*, 127th Judicial Dist. (2024) (No. 2024-43394). Defendant's threats at every turn have been "backed by [his] unilateral power to act or, at the very least, inflict '*some form of punishment.*'" *Missouri*, 83 F.4th at 385 (emphasis in original) (quoting *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003)). However, this power is not unfettered.

A Texas judge even admonished the Attorney General for abusing his authority to "harass a human rights organization with impunity and with disregard to his duty to faithfully uphold the laws of Texas and the United States." Ex. __ (Order Granting Mot. for Summ. J.) at 3. Thus, Defendant clearly possesses the regulatory authority for such an investigation, and the second guidepost likely favors Las Americas.

Third, Las Americas considers the CID and underlying investigation as a threat with the underlying message that Las Americas needs to stop providing legal services and community education or face Defendant's unjustified wrath. Las Americas has closely followed Defendant's attempts to harass, intimidate, and shut down similarly situated organizations. Compl., Dkt. 1 ¶ 38. As Las Americas Executive Director Marisa Limon Garza told NBC 5 News in July, "If this

organization [Annunciation House] that has over 40 years of commitment to standing in solidarity with the most vulnerable in our region is in the eye of the administration, that makes you wonder if your organization will be next[.]"[8] And, sure enough, Las Americas is now Defendant's most recent target.

Following the initiation of Defendant's investigation into Annunciation House, Las Americas even changed some its operations in hopes of avoiding such scrutiny from Defendant—including spending over $25,000 in updating the security and technology of the organization.[9] Las Americas was concerned about Defendant's attempt to physically enter Annunciation House to obtain documents, and wanted to protect its space.

Las Americas fears the CID is the beginning of Defendant's attempt to shut down Las Americas or otherwise make its existence in Texas untenable if Las Americas does not yield to Defendant's demands. Compl., Dkt. 1 ¶ 63. And even if Las Americas were to comply with the CID, Defendant has not looked kindly on other non-profits that worked with him cooperatively in response to his demands. *Id.* ¶ 34. Instead, he employed more aggressive tactics against them and even sought to shut some of them down. *Id.* ¶¶ 34–35. It is clear that Las Americas' provision of legal services and community education concerning immigration matters are the catalysts for Defendant's issuance of the CID and investigation. *Id.* ¶ 78. Thus, the third guidepost—Defendant perceiving the Las Americas' speech as a threat—is satisfied.

Fourth, Defendant's CID indisputably refers to adverse consequences, including criminal punishment for intentional noncompliance, and suggests that Las Americas is engaging in

---

[8] Valerie Gonzalez, *Texas is Still Investigation Migrant Aid Groups on the Border After a Judge's Scathing Order*, NBC 5 News DFW (July 6, 2024, 9:48 AM), https://www.nbcdfw.com/news/local/texas-news/texas-migrant-aid-group-investigation/3585182/?os=icXa75GDUbbewZKe8C&ref=app.
[9] Special to El Paso Matters, *Texas' Attorney General is Increasingly Using Consumer Protection Laws to Pursue Political Targets*¸ El Paso Matters (May 30, 2024), https://elpasomatters.org/2024/05/30/texas-ag-ken-paxton-annunciation-house-ruben-garcia-consumer-protection-laws/.

"fraudulent and deceptive legal services," an allegation that would make any law firm fearful, no matter how unfounded. Dkt. 1, Ex. 1 (CID - Dkt. 3). In response, and in the current fearful climate that Defendant has created for immigration nonprofits, Compl., Dkt. 1 ¶ 30, 37–38, Las Americas fears that Defendant could attempt to dissolve the corporation, even though he lacks any actual authority to do so. *Id*. ¶ 63.  If the corporation were dissolved, this would be a terrible blow to already scarce legal immigration resources in the El Paso area. *Id.* ¶ 23–24. Consequently, the reference of the CID to these harsh adverse consequences satisfies the fourth guidepost.

And finally, under the totality of the circumstances, *Vullo*, 602 U.S. at 191, Las Americas is likely to succeed on its First Amendment coercion claim. Defendant has weaponized and abused his monumental authority under Texas law to coerce Las Americas into censoring its protected expression. Defendant has harassed Las Americas with an insulting, threatening, and baseless investigation. Defendant's strategy is akin to "killing a person by cutting off his oxygen supply rather than by shooting him." *id.* at 197 (quoting *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (Posner, J.)), which the First Amendment forbids, *id.* at 198 ("[T]he critical takeaway is that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech."); *see also Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 448 (5th Cir. 2019) ("The First Amendment 'forbid[s] the State to exercise viewpoint discrimination[.]'") (quotation omitted) (alteration in original). With all four guideposts likely to be met, Las Americas is likely to succeed on the merits of its First Amendment coercion claim.

### 4.      Las Americas Is Likely to Succeed on the Merits of its Expressive Association Claim.

Given the facts in this case, Las Americas is likely to succeed on the merits of its expressive association claim under the First Amendment. The U.S. Supreme Court "has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right

to associate with others.'" *Americans for Prosperity Found. v. Bonta* ("*AFP*"), 594 U.S. 595, 611 (2021) (quotation omitted). More specifically, "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *N.A.A.C.P. v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460–61 (1958). When evaluating claims of expressive association, courts first "determine whether the group engages in expressive association," meaning the group "associate[s] together in groups to 'advanc[e] beliefs and ideas.'" *Mote v. Walthall*, 902 F.3d 500, 506–07 (5th Cir. 2018) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)). If a restriction impinges on the rights of expressive association, the restriction must satisfy, at a minimum, exacting scrutiny. *AFP*, 594 U.S. at 611 (plurality op.). Exacting scrutiny means that Defendant must demonstrate "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and that the disclosure requirement is "narrowly tailored to the interest it promotes." *Id.* Here it is clear that (1) the CID and surrounding investigation likely impair Las Americas' right to association, and (2) the CID and surrounding investigation likely fail exacting scrutiny.

> (a) *The CID and Surrounding Investigation Likely Impair Las Americas' Right to Expressive Association.*

Defendant's CID vaguely accuses Las Americas, without evidence, of providing "fraudulent and deceptive legal representations." The CID also demands documents at the core of the attorney-client relationship, which seriously undermines Las Americas' ability to exercise its associational rights in two respects. Even in so far as Las Americas has shared information with the federal government, and it is therefore not privileged, information can still be *confidential*. *See e.g.*, Tex. Disciplinary R. of Prof. Conduct, § 1.05(a–b) (State Bar of Tex. 2022) (stating that "[c]onfidential information" includes both "privileged information" and "unprivileged client information" and noting that "a lawyer shall not knowingly reveal confidential information of a

client or a former client") (emphasis added); Tex. Disciplinary R. of Prof. Conduct, § 1.05 cmt 4 ("Rule 1.05 also furnishes considerable protection to other information falling outside the scope of the privilege. Rule 1.05 extends ethical protection generally to unprivileged information relating to the client or furnished by the client during the course of or by reason of the representation of the client."); 8 U.S.C. § 206 (describing confidentiality of documents related to asylum). Thus, Las Americas' clients have a reasonable expectation of confidentiality with their lawyers and their legal teams.

First, the threat that Las Americas might be forced to produce a confidential or privileged document has forced it to alter its attorney-client relationships and those relationships are at the core of Las Americas' expressive association. *See supra* § A.1. For example, because the CID requests confidential, personal information about clients, Las Americas is now altering the types of cases it takes. Compl, Dkt. 1, ¶ 50. It has also stopped accepting walk-in appointments for risk of doing anything that Defendant might decide to attack. *Id*. ¶ 59. More broadly, the attorney-client relationships Las Americas fosters are grounded in confidentiality and building trust with a client population that frequently does not speak English and has been previously abused by legal processes in other countries. *Id*. ¶ 24. Las Americas is also working to advise its clients that their ability to protect client communications could be compromised by Defendant. *Id*. ¶ 49. Attacks on the sacrosanct attorney-client relationship will inevitably deter future clients and interested people from seeking Las Americas' assistance. And may also deter lawyers and others from wanting to work at Las Americas. *Id*. ¶ 54. Accordingly, the issuance of the CID and the surrounding investigation threaten Las Americas' promise of confidentiality to its clients and its ability to partner with attorneys who otherwise would eagerly provide assistance.

Second, the Attorney General's use of the CID threatens to compel disclosure of the names of people Las Americas has provided with legal assistance. Even with a privilege log and the assertion of attorney-client privilege to protect certain information, this does not stop Defendant from pursuing further action to compel more specific information. *See, e.g.* Compl., Dkt. 1 ¶ 34. This is the exact issue the Supreme Court encountered in *N.A.A.C.P. v. State of Alabama ex. rel Patterson*, where it held unconstitutional a lower court's order compelling the NAACP to disclose its membership to the state of Alabama in litigation. 357 U.S. at 462. There, the Court recognized that disclosure of NAACP's local members would expose "th[ose] members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* The Court then reversed the Supreme Court of Alabama and held the compelled disclosure order violated the First Amendment because it would have "induce[d] members to withdraw from the Association and dissuade[d] others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *Id.* at 463.

*Patterson* demonstrates the significant impact the CID will have on Las Americas' associational rights. Just as in *Patterson*, compelled disclosure of Las Americas' client information would threaten those clients with harassment and adverse legal action. Compl, Dkt. 1, ¶ 23. And again, just like in *Patterson*, disclosure of client lists or confidential information would certainly dissuade others from seeking Las Americas' assistance in the future. *Id*. ¶ 24. *See Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."). The CID imposes these demands within an environment of rampant hostility towards people seeking immigration protections that they are entitled to under federal law. *See id.* at 524 (recognizing impact of "fear of community hostility" on association's

ability to keep and gain members); Compl, Dkt. 1, ¶¶ 23, 66. Taken together, these circumstances are substantially likely to interfere with Las Americas' current client relationships and future relationships with its service population.

(b)      *The CID and Surrounding Investigation Likely Fail Exacting Scrutiny.*

Because Defendant's sham investigation threatens Las Americas' associational rights, Defendant must satisfy exacting scrutiny, which he cannot. *See AFP*, 594 U.S. at 611. The Supreme Court has stated that to show exacting scrutiny, a party must be able to demonstrate "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and that the disclosure requirement is "narrowly tailored to the interest it promotes." *Id.* Here, the CID and the investigation bear no relationship to a sufficiently important government interest and, even if they did, they fail narrow tailoring. *Id.*

As explained, Defendant's investigatory tactics against Las Americas and other immigrant service organizations is fueled by his own viewpoint-based vendetta. This, by definition, does not correspond to an important government interest. *See, e.g.*, *Collins v. Ainsworth*, 382 F.3d 529, 544 (5th Cir. 2004) ("[D]iscouraging a First Amendment-protected [performance] . . . would not constitute a legitimate public interest].]").

But even assuming Defendant has an interest in preventing fraud or monitoring the practice of law in his official capacity as Attorney General, the CID's disclosure requirements are not narrowly tailored. In *United Mine Workers of America, District 12 v. Illinois State Bar Ass'n*, 389 U.S. 217 (1967), the Supreme Court reversed a state's highest court, which had enjoined union members from contracting with a lawyer of their choosing to represent members in workers compensation claims. *Id.* at 218–19. The Court invalidated the injunction because it violated the union's "right of an association to provide legal services for its members." *Id.* at 222 (citing *Trainmen*). The Court rejected the Illinois State Bar Association's argument that the injunction

22

was necessary to prevent conflict of interests because there was "no indication that [the conflict] . . . ever arose." *Id.* at 224. Therefore, the injunction unconstitutionally "substantially impair[ed] the associational rights of the [union]."

Here, whatever interest Defendant might claim in investigating Las Americas is poorly served by the CID in light of the significant restraint on protected association the CID inflicts on Las Americas, its clients, and its community partners. Defendant made this request without any evidence or any explanation for why client documents are relevant in light of the serious harm disclosure would inflict on Las Americas and its clients. Perhaps Defendant's request is prophylactic, simply to assure himself that Las Americas has not committed any fraudulent practices. But "[m]ere administrative convenience does not remotely 'reflect the seriousness of the actual burden' that the" CID and investigation poses. *AFP*, 594 U.S. at 597–98 (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)). Defendant's actions, then, likely fail exacting scrutiny, and Las Americas is likely to succeed on its expressive association claim.

## B.   Las Americas Is Likely to Face Irreparable Harm Without Issuance of a Temporary Restraining Order & Preliminary Injunction.

Having established a likely violation of its First Amendment rights, Las Americas easily fulfills the remaining factors for emergency relief. As the Fifth Circuit has definitively held, "[t]he 'loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury.'" *Opulent Life Church v. City of Holy Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This is true whether the "First Amendment interests [are] . . . threatened or in fact being impaired at the time relief [is] sought." *Elrod*, 427 U.S. at 373.

"There can be no question that the challenged [actions], if enforced, will cause irreparable harm," *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020), because without

an injunction, Las Americas will continue to censor its speech out of fear that Defendant will continue to weaponize his power to suppress Las Americas' protected speech and associational rights. Compl, Dkt. 1, ¶ 48.

### C.   The Equities Weigh in Favor of an Injunction and an Injunction Is in the Public Interest.

Las Americas also satisfies the final two factors for a preliminary injunction: any potential injury to Defendant from an injunction will be minimal in light of the harm to Las Americas, and an injunction will serve the public interest. *Speaks*, 445 F.3d at 399–400 (quotation omitted). Defendant will suffer no harm if enjoined because, as explained, Defendant's "investigation" is an overbroad fishing expedition designed to target and harass Las Americas, rather than a measure used to achieve a lawful objective. Defendant's unconstitutional objective "is really 'no harm [to Defendant] at all.'" *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (quotation omitted). Las Americas, on the other hand, faces a real threat to its ability to continue engaging in constitutionally protected activity during the indeterminate pendency of Defendant's "investigation." Compl, Dkt. 1, ¶¶ 50, 53, 55.

In addition, the Fifth Circuit has recognized that "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quotation omitted). This rule applies with extra force here, where Las Americas has presented substantial evidence that Defendant's weaponization of its power presents a serious threat to First Amendment freedoms of nonprofit organizations across the State—restricting such freedoms will likely have detrimental effects that may not be remedied if the Court does not act swiftly. *Supra* § III.A. Accordingly, the factors concerning equities and public interest weigh in favor of issuing a temporary restraining order and preliminary injunction.

## IV.    <u>CONCLUSION</u>

Defendant should not be permitted to wield his authoritative power as a weapon of suppression to punish those who have, and desire to act upon, different viewpoints in furtherance of their mission to help those in need of necessary immigration-related legal services. For the reasons discussed, Las Americas respectfully requests this Court enter a temporary restraining order enjoining Defendant and his officers, employees, and agents from enforcing the Civil Investigative Demand, issuing any other CID related to allegations of fraudulent or deceptive legal representations or services, or otherwise using any authoritative measures to intimidate or harass Las Americas, for sufficient time for the Court to issue a preliminary injunction issuing the same relief during the pendency of this litigation.

Dated: September 25, 2024                         Respectfully submitted,

                                                  */s/ Thomas M. Melsheimer*
                                                  Thomas M. Melsheimer
                                                  Texas Bar No. 13922550
                                                  Scott C. Thomas
                                                  Texas Bar No. 24046964
                                                  Michael A. Bittner
                                                  Texas Bar No. 24064905
                                                  Ashley J. Wright
                                                  Texas Bar No. 24100390
                                                  **WINSTON & STRAWN LLP**
                                                  2121 N. Pearl Street, Suite 900
                                                  Dallas, TX 75201
                                                  Telephone: (214) 453-6500
                                                  tmelsheimer@winston.com
                                                  scthomas@winston.com
                                                  mbittner@winston.com
                                                  ajwright@winston.com

                                                  Erin D. Thorn
                                                  Texas Bar No. 24093261
                                                  Daniel Hatoum
                                                  Texas Bar No. 24099136
                                                  Kassandra Gonzalez

Texas Bar No. 24116439
**TEXAS CIVIL RIGHTS PROJECT**
P. O. Box 17757
Austin, Texas 78760
(512) 474-5073 ext. 182
(512) 474-0726 (fax)
aron@texascivilrightsproject.org
daniel@texascivilrightsproject.org
kassandra@texascivilrightsproject.org

Travis Walker Fife
Texas Bar No. 24126956
**TEXAS CIVIL RIGHTS PROJECT**
P.O. Box 1108
Houston, TX 77251
(832) 971-8984 ext. 186
(832) 554-9981 (fax)
travis@texascivilrightsproject.org

*Counsel for Las Americas Immigrant Advocacy Center*

## CERTIFICATE OF CONFERENCE

The undersigned contacted counsel who is listed as lead attorney in the Civil Investigative Demand at issue in the above-captioned case and informed counsel of this filing via email. Given the irreparable harm Plaintiff may otherwise face related to the requested relief herein, counsel for Plaintiff could not wait for a response or position from Defendant's counsel.

*/s/ Ashley J. Wright*
Ashley J. Wright

## CERTIFICATE OF SERVICE

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served a copy of this document via the Court's CM/ECF system on September 25, 2024, and via email.

*/s/ Thomas M. Melsheimer*
Thomas M. Melsheimer

26